IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH<br><br>Facebook, Inc. User Account associated with Brett Kuntz<br><br>Facebook, Inc. User Account associated with Bret Walking Elk<br><br>Facebook Inc. User Account associated with Trenten Delker | Case No. 1:19-mj-182<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

I, Kevin Lau, being first duly sworn, hereby depose and state as follows:

### I.  INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for search warrants for information associated with certain Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., hereinafter referred to as Facebook, a social networking company headquartered at Facebook, 1601 Willow Road, Menlo Park, California 94025. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user IDs.

2. I am a Special Agent ("SA") with the United States Department of the Interior – Bureau of Indian Affairs ("BIA") – Division of Drug Enforcement ("DDE"), currently assisting other BIA-DDE agents in North Dakota. I became a BIA SA in July of 2017 and was assigned to

1

North Dakota. Since November of 2018, I have been assigned to the United States Drug Enforcement Administration ("DEA") – Asheville Post of Duty ("APOD") in Asheville, North Carolina ("NC"). I am "an investigative or law enforcement officer of the United States," within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516 and Title 21 of the United States Code. Prior to becoming a BIA SA, and between 2012 and 2017, I was a Reserve Police Officer for the Locust Grove Police Department in Locust Grove, Oklahoma; I was a Detention Officer and then Deputy for the Tulsa County Sheriff's Office in Tulsa, Oklahoma; and a Police Officer for the BIA in Wyoming.

3. I have received training from several state, local, and federal law enforcement agencies throughout the United States. I am a graduate from the Council on Law Enforcement Education and Training ("CLEET") in Ada, Oklahoma and from the Federal Law Enforcement Training Center ("FLETC") in Artesia, New Mexico and Glynco, Georgia.

4. I have conducted and/or participated in many complex investigations utilizing a variety of investigative techniques to include, but not limited to: physical and electronic surveillance; questioning of witnesses, suspects, and informants; applications for and executions of search, seizure, and arrest warrants; and evidence collection. I also have training and experience in the recognition of controlled substances and paraphernalia used for ingesting, distributing, manufacturing, and storing controlled substances; as well as, recognizing conduct common to drug traffickers such as the laundering of drug proceeds derived from the sale of controlled substances.

5. I have also conducted and/or participated in numerous drug trafficking investigations and learned that drug traffickers often use cellular telephones and Facebook to assist in their activities. Such cellular telephones often times contain lists of contacts for customers,

associates and sources of supply (including names, addresses, phone numbers, email addresses, and other identifying information); information related to types, amounts and prices of drugs being trafficked, imported or purchased; and information related to dates and places of specific transactions. Such Facebook accounts also often times contain the same types of information. The majority of the controlled substances found in the United States are imported from foreign nations and the majority of those controlled substances then move through a variety of states before ending up at their final destination. Information related to international and/or domestic travel are often times stored on the cellular telephones and Facebook accounts of drug traffickers. Additionally, modern cellular telephones often have the ability to access the Internet, allowing the phone's user(s) to access financial records and perform monetary transactions, send and receive emails, browse web addresses, and access other information available on the Internet to assist in drug trafficking activities such as Facebook/Instagram and other applications ("apps") used to communicate both publicly and privately – such as through Facebook Messenger.

6. The facts and information contained within this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses/sources. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846, involving conspiracy to distribute and possess with intent to distribute crystal methamphetamine, have been committed by **BRETT KUNTS ("KUNTZ")** and **BRET WALKING ELK ("WALKING ELK")**. There is also probable cause to search the items described in Attachment A for the information described in Attachment B which is evidence of those crimes.

## II.   PROBABLE CAUSE

8.   As set forth in more detail elsewhere in this affidavit, the BIA; Drug Enforcement Administration ("DEA"); the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); and the Metro-Area Narcotics Task Force ("MANTF") is investigating the drug trafficking activities of **KUNTZ, WALKING ELK,** and others. Based upon the information obtained during the course of this investigation, I believe that **KUNTZ** and **WALKING ELK** and distributes controlled substances, including methamphetamine, to customers in North Dakota.

9.   I have reason to believe that the accounts, which are the subject of the requested warrants, will contain stored information and communications relevant to this investigation, to include evidence of the identity of the person or persons maintaining the accounts and other accounts associated with Facebook accounts (i.e. usernames and user IDs). The accounts that are the subject of the requested warrants are described in Attachment A and as follows:

    a.   the Facebook, Inc. User Account associated with Brett Kuntz:

- 100000444744366

    b.   the Facebook, Inc. User Account associated with Bret Walking Elk:

- 100000017543569
- 100023272714053
- 100036385996807
- 100013128969819

10.   On May 15, 2019, BIA SA Lau submitted a preservation request to Facebook for the following Facebook ID(s): 100000444744366.

**Initial Drug Trafficking Investigation**

11.   In May of 2018, the BIA, DEA, ATF, and MANTF began investigating a Drug Trafficking Organization ("DTO") operating in the Burleigh County, North Dakota ("ND") and Morton County, ND area. Agents learned that DTO's drug trafficking activities encompassed

4

multiple counties in ND – to include the Standing Rock Indian Reservation ("SRIR"). The investigation identified **KUNTZ** is capable of distributing and/or orchestrating the distribution of ounce quantities of crystal methamphetamine. Furthermore, through the course of this investigation, agents gleaned that **KUNTZ** conspires with others to facilitate the distribution of crystal methamphetamine.

12.     On May 13, 2019, under the direction and control of myself and other agents, a BIA confidential source (hereinafter referred to as "CS") utilized Facebook Messenger to contact **KUNTZ's** Facebook user account: brett.kuntz.3 with user ID 100000444744366 to negotiate the purchase of crystal methamphetamine. **KUNTZ** told the CS that he wanted some "shit" (from my training and experience, I know the term "shit" means crystal methamphetamine) for brokering the purchase of crystal methamphetamine.[1]

13.     On May 14, 2019, under the direction and control of myself and others agents, the CS negotiated the purchase of one (1) ounce of crystal methamphetamine from **KUNTZ**. The CS met **KUNTZ** at a gas station in Mandan, Morton County, ND, who then met with **BRET WALKING ELK's ("WALKING ELK")**. **WALKING ELK** informed the CS and **KUNTZ** that they could follow him to his Source of Supply ("SOS") in Mandan, Morton County, ND. **WALKING ELK** then met with **TRENTEN DELKER ("DELKER")**. The CS provided $1,000.00 in BIA Confidential Advanced Funds ("CAF") to **KUNTZ**, who then provided it to **WALKING ELK. WALKING ELK** left with **DELKER**, who then distributed one (1) ounce of

---

[1] CS has been arrested for multiple offenses, ranging from driving under suspension to possession of paraphernalia and methamphetamine. Since approximately 2015, CS has been providing information to law enforcement in exchange for payment. Because the information provided by CS has been corroborated by information myself and other agents gathered during the investigator, I believe the information provided by CS is reliable. I am aware of no instances where CS lied or attempted to mislead investigators.

crystal methamphetamine to **WALKING ELK**. **WALKING ELK** then gave the crystal methamphetamine to **KUNTZ** who then gave it to the CS.

14. On May 15, 2019, under the direction and control of myself and others agents, the CS negotiated the purchase of two (2) eight (8) balls of crystal methamphetamine (an eight ball is slang for 1/8 ounce) from **KUNTZ,** via Facebook Messenger. The CS met **KUNTZ** at Wal-Mart in Mandan, Morton County, ND, who, again, traveled with **KUNTZ** to **WALKING ELK's** residence. The CS gave $300.00 USC in BIA CAF to **KUNTZ**, who then gave it to **WALKING ELK**. **WALKING ELK** then gave two eight (8) balls of crystal methamphetamine in exchange for $300.00 USC to **KUNTZ**, who then gave it to the CS.

15. On May 15, 2019, I obtained **KUNTZ's** North Dakota criminal history and learned that he had multiple arrests since 2014. **KUNTZ's** arrests range from possession drug paraphernalia, possession of drugs, ingesting controlled substances, and probation violation. **KUNTZ** was convicted in 2014 and 2016 of a felony for possession of a drugs and controlled substance.

16. Based on the above, I believe that **KUNTZ** is trafficking drugs and utilizes Facebook to facilitate the distribution of controlled substances.

D.   **Facebook Accounts**

17. Through my training and experience with Facebook, I know voice calls and voice messages can be made through Facebook with a cellular telephone.

18. On May 15, 2019, I found a Facebook profile for **KUNTZ**: **www.facebook.com/brett.kuntz.3**, with Facebook User ID: 100000444744366. The CS positively identified all the Facebook profiles that I found as **KUNTZ's** and showed me messages of the CS and **KUNTZ** negotiating the purchase of crystal methamphetamine.

6

a. I reviewed all of **KUNTZ's** Facebook profiles and learned that Facebook user IDs: 100000444744366 showed that **KUNTZ** was from Rapid City, South Dakota ("SD").

b. Additionally, the profile picture on Facebook user ID: 100000444744366, had a similar male that I positively identified as **KUNTZ** through law enforcement booking photos.

19. Through my training and experience, I know that people involved in a drug trafficking conspiracy generally communicate frequently through a variety of methods, such as phone calls, text messages, e-mails, Voice-Over IP (VoIP) messages (i.e. TextNow, WhatsApp, etc.), Facebook, Facebook Messenger, Instagram, etc. I know from experience that Facebook, Facebook Messenger, Instagram as well as other apps, are commonly used to facilitate the buying and selling of controlled substances. Furthermore, I have learned that people involved in criminal activity frequently and commonly use Facebook Messenger to communicate with each other, as it can be a more secure way of communicating than text messaging, and more difficult for law enforcement to detect. Facebook Messenger also allows selective access to communication to other person(s) involved. I am also aware that people involved in criminal activity discuss, plan, and communicate about the crime both before as well as after the crime has been committed. Lastly, I have learned that people involved in criminal activity commonly have multiple Facebook profiles and will use aliases and/or fake names that make it difficult for law enforcement to further their investigation.

20. Based on the foregoing, I believe that **KUNTZ** conspired to facilitate the sale and/or distribution of a controlled substance in part or in whole through text messages, voice calls, and data calls and/or through Facebook and Facebook Messenger to individuals throughout the

7

SRIR area. I further believe that **KUNTZ** is currently using Facebook or Facebook Messenger to communicate with others to avoid law enforcement.

### III.   SPECIFIC INFORMATION PERTAINING TO FACEBOOK

21. I know from experience that Facebook and Facebook Messenger can be used from different devices such as computers, smart phones, smart tablets, etc. The user does not and is not required to use one specific device to log into a Facebook profile.

22. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

23. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

24. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

26. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the

photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

28. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

29. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

31. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the

account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

34. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

35. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

36. In addition to the apps described above, Facebook also provides its users with access to thousands of other apps on the Facebook platform. When a Facebook user accesses or uses one of these apps, an update about that the user's access or use of that application may appear on the user's profile page.

37. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

38. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook apps.

39. Facebook also retains Internet Protocol ("IP") logs for a given user ID/username or IP address *(IP address, as used herein, is a code made up of numbers separated by dots that identifies a particular computer on the Internet. Every computer requires an IP address to connect to the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. A creation IP address is the address used on the date that an e-mail account is created by the user)*. These logs may contain information about the actions taken by the user ID/username or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID/username and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

40. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service

(including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its

services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

42. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## IV. INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

43. I anticipate executing the requested warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## V. JURISDICTION

44. This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711; 18 U.S.C. § 2703(a), (b)(1)(A) &

(c)(1)(A). Specifically, the United States Court for the District of North Dakota is a district court of the United States that has jurisdiction over the offense being investigated.

45. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for this warrant's service or execution.

## VI. REQUEST FOR SEALING

46. I further requests that the Court order that all papers in support of this application, including the affidavit and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## VII. CONCLUSION

47. Based on the forgoing, I request that the Court issue the proposed search warrants. FURTHER YOUR AFFIANT SAYETH NOT.

Respectfully submitted,

Kevin Lau
Special Agent/Task Force Agent
BIA/DEA

SUBSCRIBED and SWORN
before me this 20th Day of May, 2019

CLARE HOCHHALTER
United States Magistrate Judge